IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 1, 2019

## IN RE  CHANNING M.

**Appeal from the Chancery Court for Hawkins County**
**No. 2017-AD-6        Douglas T. Jenkins, Chancellor**

———————————————————

**No. E2019-00504-COA-R3-PT**

———————————————————

This is a termination of parental rights case.  After the death of the mother, petitioner—the child's maternal grandmother—sought to terminate the father's parental rights on four grounds: abandonment by failure to support the child; abandonment by failure to support the mother; abandonment by failure to visit the child; and failure to manifest ability to take custody of the child.  The trial court found that clear and convincing evidence existed to terminate father's parental rights only on the ground of abandonment by failure to support the child.  The trial court further found that termination was in the best interests of the child.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**
**and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and FRANK G. CLEMENT, JR., P.J., M.S., joined.

Gerald T. Eidson, Rogersville, Tennessee, for the appellant, William S.

Tammy M., Rogersville, Tennessee, Pro se.[1]

## OPINION

### I. BACKGROUND AND PROCEDURAL HISTORY

The child at issue in this case, C.M. (the "Child"), was born February 2013 to Jessie M. ("Mother") and William S. ("Father").[2]  For the first two years of the Child's

———————————————————

[1] Appellee Tammy M. did not file a brief or otherwise participate in this appeal.
[2] In cases involving minor children, it is this Court's policy to redact names sufficient to protect the children's identities.

life, neither Mother nor Father knew with certainty the paternity of the Child; however, when the Child was about two years old, Mother began reaching out to Father about the possibility of his being the Child's father. Father testified that it was during this time— either late 2015 or early 2016— when he saw a picture of the Child, noticed the resemblances between the two of them, and began to believe that the Child was his son. Around the same time, Mother also approached Father's mother, Vonda S. ("Ms. S."), in order to establish a relationship between her and the Child. Mother took the Child to visit Ms. S. two to three times a week, and, as a result, Father also began to see the Child more often. According to Father, "we just worked our way into it slowly."

Mother, however, was murdered on August 12, 2016. Upon investigation, Ms. S. became a suspect and was ultimately tried and convicted of Mother's murder.[3] Immediately following Mother's death, Tammy M., the Child's maternal grandmother ("Grandmother"), took custody of the Child.[4] On August 17, 2016, Father filed in the Greene County Juvenile Court (the "juvenile court") a petition seeking legitimation and custody of the Child. The juvenile court entered an order on December 7, 2016 in which it found that, based on the results of paternity testing, Father is the biological father of the Child. However, pending a further investigation into the facts, the juvenile court ordered that Grandmother would retain temporary custody of the Child, reserving the matters of visitation and custody for December 20, 2016. At the December 20, 2016 hearing, the juvenile court entered an order with the following conditions regarding such matters:

> [T]hat upon the selection of a neutral independent supervisor, [Father] may begin supervised visitation with [the Child], to occur at a public place that the parties can agree upon. Only the supervisor and [Father] will be in attendance at these visits.

> [T]hat [Father] is authorized to communicate with [the Child's] therapist to arrange for therapeutic counseling with [the Child] in an effort to better learn about [the Child's] needs and to assist [the Child] in coping with the loss of his Mother.

On March 1, 2017, Grandmother, as the prospective adoptive parent of the Child, filed a petition in the Hawkins County Chancery Court (the "trial court"), seeking an order terminating Father's parental rights. In the petition, Grandmother alleged four grounds for termination: (1) abandonment by willful failure to support the Child; (2) abandonment by failure to visit the Child; (3) failure to manifest the ability to take custody of the Child; and (4) abandonment by failure to support Mother. A hearing on

---

[3] While documentation of Ms. S.'s conviction is not included in the record on appeal, the trial court noted in its oral findings that all parties assented to this fact.

[4] Mother and the Child had been living at home with Grandmother and her husband, Mother's two sisters, and one of the sister's three children.

Grandmother's petition was held on October 9, 2018, and, on February 20, 2019, the trial court entered an order terminating Father's parental rights. The trial court found that Grandmother did not present clear and convincing evidence as to the grounds of abandonment by failure to visit, abandonment by failure to support Mother, and failure to manifest ability to take custody; however, because Father admitted that he paid no child support during the relevant statutory period despite his ability to do so, the trial court found clear and convincing evidence that he willfully failed to support the Child. The trial court subsequently determined that termination was in the Child's best interests and terminated Father's parental rights. Father timely appealed.

## II. ISSUE PRESENTED

Father raises only one issue on appeal: whether the trial court erred in finding that it was in the Child's best interest to terminate his parental rights.

## III. STANDARD OF REVIEW

Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only when a compelling interest exists. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769. Accordingly, both the grounds for termination and that termination of parental rights is in the child's best interest must be established by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id*.

In view of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review in Tennessee Rule of Appellate Procedure 13(d).  As to the trial court's findings of fact, our review is de novo with a presumption of correctness unless the evidence preponderates otherwise.  Tenn. R. App. P. 13(d).  We must then determine whether the facts, as found by the trial court, clearly and convincingly establish the elements necessary to terminate parental rights. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

## IV. GROUNDS FOR TERMINATION OF PARENTAL RIGHTS

On appeal, Father challenges only the trial court's finding that termination is in the Child's best interest; however, this Court must review the trial court's finding that clear and convincing evidence exists to support the alleged ground for termination, as well.  As the Tennessee Supreme Court has held previously, "in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016) (citing *In re Angela E.*, 303 S.W.3d 240, 251 n.14 (Tenn. 2010)).

Termination of a parent's rights may be initiated based on "[a]bandonment by the parent or guardian, as defined in § 36-1-102 . . . ."  Tenn. Code Ann. § 36-1-113(g)(1). Tennessee Code Annotated section 36-1-102 outlines several definitions of "abandonment."  As is relevant to this ground, the statute provides that "abandonment" means:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent . . . of the child who is the subject of the petition for termination of parental rights or adoption, that the parent . . . [has] willfully failed to support or [has] willfully failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i).[5]  Here, Grandmother filed the termination petition on March 1, 2017.  Accordingly, we look from November 1, 2016 to February 28, 2017 as the relevant statutory period.

---

[5] In 2018, the Tennessee General Assembly amended this subsection to remove the element of willfulness from the definition of abandonment by failure to support or visit.  Rather than include willfulness as an element of the ground, Tennessee Code Annotated section 36-1-102(1) now provides that it is an affirmative defense:

> For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not

Parents who are eighteen years of age or older are presumed to be aware of their duty to support their children. *See* Tenn. Code Ann. § 36-1-102(1)(H). Moreover, "the obligation to pay support exists even in the absence of a court order to do so." *In re Michaela V.*, No. E2013-00500-COA-R3-PT, 2013 WL 6096367, at *8 (Tenn. Ct. App. Nov. 19, 2013). For purposes of this ground, Tennessee Code Annotated section 36-1-102(1)(D) defines "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" as "the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D).[6] The statute defines "token support" as support that, "under the circumstances of the individual case, is insignificant given the parent's means[.]" Tenn. Code Ann. § 36-1-102(1)(B). "Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. Ct. App. 2013).

In its order terminating Father's parental rights, the trial court found, in relevant part, the following:

> I very much believe what this father told me on the witness stand, that he was estranged from the mother for a period of time after the birth of the child but that then the mother approached his own mother and they

---

> willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure[.]

Tenn. Code Ann. § 36-1-102(1)(I). We have previously held that this change will not apply retroactively. *See In re Gabriel B.*, No. W2017-02514-COA-R3-PT, 2018 WL 3532078, at *4 n.7 (Tenn. Ct. App. July 23, 2018) ("Because this change is substantive rather than procedural or remedial, however, the amended statute will not be applied retroactively to this case.") (citing *In re D.A.H.*, 142 S.W.3d 267, 273 (Tenn. 2004)). Thus, we apply the version of the statute in effect when the case was initiated.

[6] Again, this statute has since been amended by removing the element of willfulness from the definition. It now reads as follows:

> For purposes of this subdivision (1), "failed to support" or "failed to make reasonable payments toward such child's support" means the failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child. That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant four-month period[.]

Tenn. Code Ann. § 36-1-102(1)(D). However, as stated in the previous footnote, we apply the version of the statute at issue when the case was initiated.

started up a relationship, and he either saw a picture of the child or the child, and the Court will acknowledge, based on what it's seen, that the child does bear a somewhat striking resemblance to him, and so, common-sensically [sic], the Court can see how that would make him think he was the father.

But when he started thinking he was the father, he still did very little, I think, beyond – not much beyond token support for that child. But even if he had paid guideline support, it would be irrelevant, because the period of time that we're looking at is November the 1st, 2016 to March 1st, 2017, and we all know that he paid no support during that period of time.

He was, as Ms. Fairchild pointed out, working, making pretty good money. His girlfriend was working, making even more money than he was. He didn't say at any time during this trial that he couldn't have paid support. And he admitted that during the four months that's relevant he paid none.

The trial court's findings are supported by the record—most notably, Father's admission that he did not pay any support for the Child from November 1, 2016 to February 28, 2017. When asked to provide proof of each and every child support payment that he had made, Father responded that he "does not currently pay child support" but that he had helped Mother out with certain payments, such as necessary household items, vehicle maintenance, and transportation. Other than Father's own testimony, however, there is scant evidence to support his claim. For example, there is a receipt from Boulevard Motors with a handwritten note from Mother indicating that Father "gave me $100.00 [to] help with her car." The receipt, however, also indicates that the payment was made on June 17, 2016, which is outside the relevant statutory period. Accordingly, Father's $100.00 payment to Mother for help with her car is irrelevant for our review. Additionally, a set of receipts from Walmart includes a handwritten note from Mother indicating that Father made an additional $100.00 payment to Mother because the Child was going to Dollywood. However, the only date provided indicates that such payment was made on April 29, 2016—again, outside the relevant statutory period. While these payments—if made during the relevant statutory period—would be considered nothing more than token support, Father also admitted in his testimony that he had no proof of any other payments during the relevant statutory period:

The Court: Other than a hundred dollars here, hundred dollars there, did you ever pay regular support?
. . . .
[Father]: Oh, yes, sir.
The Court: Where's your proof of that?
[Father]: (No response.)

The Court: Was it cash?

[Father]: Yes, sir.

The Court: So you're testifying under oath to me –

[Father]: Yes, sir.

The Court: – that you gave [Mother] $50 or some –

[Father]: Well, I – she would – I would never give her $50. She would never ask me for that. When she would – She would never ask me directly for money. She would go through my mother or her – Brittany, and I would take it to my mother's car, and she would go by there and get it.

The Court: Okay.

[Father]: And I – I had text messages –

The Court: But you don't have any proof, then –

[Father]: No, sir.

Further, and most significantly, when asked the date and amount of his last child support payment, Father responded August 12, 2016—outside of the relevant statutory period.

The record also reflects that Father acted willfully and had no justified reason for failing to provide child support. As this Court recently explained:

It is axiomatic that "in order to establish the ground of abandonment by willful failure to support by clear and convincing evidence, the party seeking termination must generally 'submit . . . evidence regarding [the parent's] employment, income, [or] other non-monetary assets' as well as the parent's 'expenses during the four-month period.'" *In re Michael B.*, No. M2015-02497-COA-R3-PT, 2016 WL 7486361, at *11 (Tenn. Ct. App. Oct. 6, 2016) (quoting *In re Destiny H.*, No. W2015-00649-COA-R3-PT, 2016 WL 722143, at *9 (Tenn. Ct. App. Feb. 24, 2016)). Such evidence need not be an accounting of every dollar earned and spent, and it need not even be tied to dollars and cents, *but it must be clear and convincing evidence that the parent had the capacity to pay support, did not do so, and had no justification for not doing so*.

*In re Preston L.*, No. M2016-02338-COA-R3-PT, 2017 WL 4315356, at *5 (Tenn. Ct. App. Sept. 27, 2017) (emphasis added). Concerning the statutory requirements that a parent's failure to support must be willful, this Court has stated that "a person acts 'willfully' if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing." *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005). Here, Father testified that, at all times during the relevant statutory period, he was working at a Walmart Distribution Center. Additionally, when pressed by the trial court as to whether he had money to pay child support, Father admitted that he did. Accordingly, Father has the "capacity to pay support, did not do so, and had no justification for not doing so." *In re Preston L.*, 2017 WL 4315356, at *5. Therefore, we

find, as did the trial court, that the ground of willful failure to support was proven against Father by the standard of clear and convincing evidence.

## V. BEST INTERESTS

When at least one ground for termination has been established by clear and convincing evidence, the court must then consider if termination is in the best interest of the child. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). Upon establishment of a ground for termination, the interests of the child and parent diverge, and the court's focus shifts to consider the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877. Tennessee's parental termination statutes recognize that although a parent may be unfit, terminating that parent's rights may not be in the best interest of the child. *Id.* As the Tennessee Supreme Court has explained:

> Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.*

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

The Tennessee Legislature has codified certain factors for the court to consider in its determination of whether termination is in a child's best interest. The factors include, but are not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or

psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). In its order terminating Father's parental rights, the trial court referenced all nine factors, ultimately finding that six of the nine weighed in favor of termination.[7] Of particular relevance, the trial court referenced Father's failure to provide child support, the stability of Grandmother's home, and the fact that Father has no relationship with the Child. Specifically, the trial court stated as follows:

> [T]he Court heard only good things about the grandmother's home. It seems to be stable. There's a grandfather in the home with a good relationship with the child, and the aunts are there, and they have a loving relationship with the child.
> . . . .
> [T]he Court does think that the stability and continuity of the home that the child is in now are very important for the child. The child is five and a half years old. The child at this point enjoys little, if any, or no remembrance of the father.

After our review of the record, we agree with the trial court's findings and conclude that there is clear and convincing evidence that termination of Father's parental rights is in the Child's best interests.

The record reflects that, aside from a nine-month period, Mother and the Child lived at home with her parents. Also in the home were Mother's two sisters, one of whom had three children of her own. At trial, Grandmother and one of the sisters testified that they interact with the Child daily and that the Child has a great relationship with everyone in the home, especially Grandmother and her husband. Moreover, because Mother gave birth to the Child when she was seventeen years old and still in high school,

---

[7] Of the remaining three factors, the trial court found two to be neutral and one to be inapplicable to the circumstances of the case.

Grandmother assumed many of the childrearing duties in order to help Mother finish school. The record also reflects that Father has no meaningful relationship with the Child. At trial, Father testified as follows:

> Q: Do you recall when [Grandmother] said – I asked her the question if [the Child] would walk in the front doors right now, would he recognize you? And her answer was no. Do you agree or disagree with that?
> . . . .
> A: I don't know if he would now or not.
> Q: But you think it's a possibility he wouldn't recognize you?
> A: Yes, sir, I think.
> Q: Because it's been, what, two – it's been over two years since you've seen him; correct?
> A: Yes, sir.
> Q: Okay, so you don't have any current bond with the child, meaning a father-son bond?
> A: No, sir.

Father has not seen the Child since Mother's death on August 12, 2016. While Father's lack of visitation can be attributed in some measure to an apparent mutual acrimony between him and Grandmother, the record does not support Father's contention that he was "denied visitation." As noted previously, the juvenile court's December 20, 2016 order provided that, upon the selection of a neutral independent supervisor, "[Father] may begin supervised visitation with [the Child], to occur at a public place that the parties can agree upon." Father and Grandmother, however, both admitted at trial that they would not agree to the other's proposed supervisors.[8] Yet, while this Court recognizes both parties' unwillingness to observe the juvenile court's order, Father nevertheless provided the following testimony:

> Q: You could have agreed to the supervisors that she suggested; correct?
> A: When they accused us of murder, no. I will not. That's your answer. No.
> Q: Do you know who was on her list of suggested supervisors?
> A: No ma'am; can't recall.
> Q: So you don't even know who was on their list?
> A: Probably her, her sister.
> Q: You don't even know who was on her list of potential supervisors, but you wouldn't agree to let any of them supervise your visitation?
> . . . .

---

[8] Father testified as follows: "She wouldn't meet my people, and I wouldn't meet hers." Grandmother's testimony echoed Father's: "He wouldn't agree to mine, and I wouldn't agree to his[.]"

A: I would not meet with any of them when they accused us of that, none of them.

Father's own testimony indicates that he could have visited with the Child had his desire to do so outweighed his feelings toward Grandmother and her family. Moreover, the record reflects that Father never went back to the juvenile court or the trial court to seek any additional relief regarding his visitation rights. Accordingly, Father's own decisions—not Grandmother's—prevented him from visiting with the Child and from forming a father-son bond, which, as he admitted, is non-existent. Further, as discussed in the previous section regarding the ground for termination, Father willfully failed to provide any support during the relevant statutory period and provided no more than token support since the time when he began to believe he was the Child's father. Accordingly, the evidence in the record on appeal does not preponderate against the trial court's findings relative to best interests, and we find, as did the trial court, that the totality of this evidence amounted to clear and convincing proof that it was in the Child's best interests for Father's parental rights to be terminated.

## VI. CONCLUSION

For the foregoing reasons, we conclude that clear and convincing evidence supports the termination of Father's parental rights on the ground of failure to support and that such termination is in the Child's best interests.

_____
ARNOLD B. GOLDIN, JUDGE

- 11 -